FILED BY _____ D.C.

JAN 17 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## UNITED STATES DISTRICT COURT
### Southern District of Florida
### (West Palm Beach Division)

JOSEPH L. WORRELL, Appellant,

vs.

Case No. 16-80837-CIV-MARRA

EMIGRANT MORTGAGE COMPANY INC, *et al.*, Appellee(s)

### MOTION FOR RECONSIDERATION AND FOR CLARIFICATION

Pursuant to Fed. R. Civ. P. 59, Appellant hereby files this motion for reconsideration and clarification of the Court's Order in this case on December 27, 2017, (Doc. No. 40), and in support thereof states as follows:

### I.   Case Chronology and Main Issues

This Appeal from Orders of the Bankruptcy Court was docketed in the District Court on May, 16, 2016, and thereafter, was fully briefed by September 26, 2016. The case essentially concerns, not just one but two, unapproved *post-petition* sales of Plaintiff's home from his Chapter 13 bankruptcy estate - at 3:04 PM on March 30, and once again at 1:18 PM on August 31, 2009, despite his known military deployment abroad and in intentional violation of Constitutional Due Process, his SCRA protected Rights, and other well-established statutory provisions expressly prohibiting such actions; See 50 USC 3000 Et. Seq. at 526, 533, 597, plus 11 UCS 101 Et. Seq., at 362. Further, the record and facts suggest, and by information and belief, it appears that at least one of the unapproved sales - the second one, would not have occurred *but not for,* and as direct result of, the connivance, conspiracy, and collusion between the court appointed trustee and Appellee EMIGRANT[1]; a New York City based notoriously predatory

---

[1] On July 27, 2016, after over six years of stonewalling litigation and five weeks of trial, a Brooklyn federal jury found EMIGRANT used its so-called "*NINA / STAR*" mortgage schemes to illegally target unsophisticated home owners and racial minorities, like here, to illegally strip away their equity prior to foreclosing. The jury, in a landmark first **reverse red lining** discrimination case, found the firm's illegal underwriting schemes also violated federal fair housing anti-discrimination lending laws, including the Fair Housing Act (FHA), and consumers' human rights.

firm already found guilty of illegally targeting racial minority homeowners across the country with *equity stripping* products carefully calculated to fail at a built-in preplanned time, in violation of federal antidiscrimination laws, and other basic rights, and whose Florida license was *terminated* since 10/13/2000.

In this case it also is undisputed that EMIGRANT in fact is without proper standing[2] to foreclose due to lacking a perfected security interest in Appellant's home, but was still wrongly permitted to prosecute its *legally impossible ab initio* claims against Appellant who, at the time was known to be militarily deployed overseas and serving the United States. The undisputed record also shows that EMIGRANT'S claims are in fact *fraudulent*; based on a defective lien and underlying promissory note *supposedly* executed one week apart from each other, and which were nonexistent at its alleged "closing" on June 23, 2005. There is also credible compelling evidence the court appointed trustee in this case, intentionally aided and abetted EMIGRANT in committing bankruptcy fraud by seeking payment from Appellant's chapter 13 estate, and also by filing false claims meant to knowingly conceal serious, if not fatal, claim defects on October 30, 2009, and Aug 17, 2010, (Case: 09-15332, DE # 37 & 49); over a year subsequent to its unapproved State-Court sale of his SCRA protected property, on August 31, 2009; thereby intentionally violating several other pertinent federal solvency and bankruptcy regulations.

Normally, especially in bankruptcy proceedings - which traditionally demand the utmost honesty from both debtors and creditors alike, these facts alone might be more than enough to justify the harshest sanctions against the *dishonest party*. However, here, the Court seems to have gone out of its way to instead sanction or silence the very party bringing to light the wrong-

---

[2] The U.S. Supreme Court has held and it is well settled, that Legal Standing is essential at every stage of a legal proceeding, and lack of standing may be raised at any time by the parties, or by the Court, sua sponte. Standing must exist at each stage throughout the litigation, cannot be conferred by agreement, and can be challenged at any time, including on appeal.

doing, and has even issued arguably *unconstitutional orders* to at least hinder, if not prevent the aggrieved party from challenging the mischievous behavior.

The case therefore involves claims of constitutionally guaranteed **Due Process**; important federal protections promised to members of the Armed Forces while on Active Duty defending the country, as provided under the Servicemembers Civil Relief Act (**SCRA-2003**), at 50 U.S.C. 3901 et seq., and the Obama amendments thereto, in addition to applicable protections under title 11 of the federal **Bankruptcy Code**.

Two of the pivotal issues here also involve the SCRA's key provisions, (1) prohibiting the "sale, foreclosure, or seizure of property" for a breach of a mortgage obligation that originated prior to the Servicemember's military service if the sale, foreclosure, or seizure is "made during, or within one year after, the period of the Servicemember's military service," unless the seller obtains sufficient court approval or *valid waiver* from the Servicemember; *Id.* at 50 U.S.C. § 3953(c); And (2) the statute's expressed protection for termination of the "right to redeem" real property which essentially provides. . . . "NO PERIOD OF ACTIVE DUTY MAY BE INCLUDED WHEN COMPUTING TIME LIMITED BY LAW TO REDEEM REAL PROPERTY". *Id.* §3936(b).

On December 27, 2017, after over a year and a half, and the court having . . . "carefully considered" the case, the decision rendered appears to blindly affirm the erroneous rulings below, having failed after such careful consideration to find sufficient *legal grounds* to support the injustices in the decisions appealed from. Appellant therefore under applicable rules, seeks reconsideration and further clarification, based on the following grounds –

## II.    Insufficient Analysis of Key Issues

A. The district Court's decision in this dispute emphasizes the key importance of the

the Servicemembers Civil Relief Act (SCRA), 50 U.S.C. 3901 et. seq., - then carefully avoids or side-steps any discussion of how those crucial **SCRA provisions** apply. This deficiency should be corrected or clarified, and explained, with supporting authorities. Since a finding that the crucial SCRA protections apply, either *by operation of law* or otherwise, might significantly alter the Court's conclusion.

**B.** The foundational case relied on both in the Court's decision and by the bankruptcy Court is grossly *dissimilar and inapplicable* to this particular dispute, hence leading to a totally flawed conclusion.

**C.** The decision also overlooks, or neglects to consider, whether Appellant's *constitutionally guaranteed right* to sufficient **Notice and Hearing** was deprived by the July 1, 2009 dismissal order, as briefed. Therefore, this key issue should be clarified and explained with supporting authorities, since the impact of not giving the parties notice and an opportunity to be heard before ordering dismissal could greatly alter the Court's conclusion.

**D.** Similarly, the decision finds, entirely absent any citation or legal authority, that in this matter Appellant's **Ownership Rights** to the home were somehow *"lost"* while he was militarily deployed abroad on August 31, 2009, merely by the county clerk's wrongful issuance of a "Certificate of Sale" for the property. That assertion is obviously legally inaccurate, for many reasons. Because sufficient legal analysis of this specific claim could greatly alter the Court's conclusion, the issue should also be adequately reconsidered, clarified, and properly explained, with supporting legal authorities.

**E.** Federal district Courts, under comity, nor other theory, are not bound by wantonly *unconstitutional actions* of State-Courts, especially in core bankruptcy matters involving statutory protected military service and, by logical extension, the national defense. Since on March 26, 2009, Appellant was unfairly forced to file for bankruptcy related to the bogus

pg. 4

"foreclosure" on his home, shortly after separation from [*supposedly*] protected service to the United States, pursuant to SCRA, 2003 and HERA, 2008; And since the first illegal sale was nonetheless still conducted, on Monday March 30, 2009, in willful deprivation of due process, federal civil rights, and bankruptcy protections; And because the clerk, acting as a government official, took part in the violations, and at 3:04 PM on that date still knowingly issued the first of two unlawful "Certificates of Sale" solely to unduly terminate protected "Rights of Redemption" on unfairly targeted valuable property, and then refused to set aside any of the wrongful actions despite repeated requests – and without providing any authentic evidence of essential standing to foreclose. Then, if in this instance the facts and credible evidence show that the clerk and others were an integral part of the deprivation of rights scheme and conspiracy at issue, and since the county clerk also stands to gain large sums of otherwise unearned revenues, plus other benefits, by participation in such sales; And because it is also abundantly clear that vacatur of the automatic stay is exclusively within the province of the federal bankruptcy Court, not the county clerk, and that any other purported waiver or annulment of the automatic stay is legally inefficacious; Each of these issues could be central to reaching the right decision, and the district Court in this instance is sufficiently endowed to preempt further injustice.

## III.    Issues for Reconsideration

### (a) *SCRA Protected Rights*

In the United States, someone performing *active duty service* is ***NOT*** normally required to notify all their creditors that they are on active duty.  Rather, federal law mandates that a party seeking to foreclose on any property in which it ***claims*** an interest, is charged with determining whether a defendant in its action may be protected by virtue of military service; *Id* at SCRA § 521(b).

Without vigorous enforcement of the SCRA, our Nation's ability to meet its critical defense needs may suffer. Congress enacted the SCRA to (1) "provide for, strengthen, and expedite the national defense" by enabling Servicemembers "to devote their entire energy to the defense needs of the Nation," and (2) "provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of Servicemembers during their military service." *Id.* 50 U.S.C. 3902; see also Brewster v. Sun Trust Mortg., Inc., 742 F.3d 876, 879 (9th Cir. 2014) (the SCRA effectuates "the Congressional purpose of granting active-duty members of the armed forces repose from some of the trials and tribulations of civilian life"). Accordingly, the United States often enforces the SCRA through litigation by the Attorney General.  See 50 U.S.C. 4041. But given the limited federal resources available to enforce the statute private actions serve an important role in the SCRA's enforcement.

The Country demands a lot from its service men and women, and among the protections and benefits afforded them in return for their service is the SCRA's long established restrictions on [*lender's*] ability to foreclose on Servicemember owned property.  For instance, any sale, foreclosure, or seizure of property for a breach of an obligation" secured by a mortgage, deed of trust or other security in the nature of a mortgage *shall not be valid* " if made ***during***, or within one year after, the period of the Servicemember's military service except upon a [*valid*] court order granted before such sale, foreclosure, or seizure with a return made approved by the court". *ld.* at § 533(c); (*Emphasis added*).

Due to the multiple deployments frequently experienced by America's warfighters nowadays, perhaps never before have the *rights* of so many hundreds of thousands of Servicemen and women come under such attack, as these procedural rights are being tested in this challenging geo-political climate, and multi decade long war on terror. The parties here have

shown such deliberate distain for the *federal statute*, including a stubborn refusal to acknowledge its statutory six percent (6%) interests cap and wrongful unfair seizure of Servicemember own property. And although they would *claim* there really were absolutely zero violations of the SCRA, the indisputable facts, circumstances, and unambiguous law in this case, would lead most fair-minded impartial observers to the totally opposite conclusion.

The title 50 SCRA *federal provisions* operate somewhat similar to the title 11 *automatic* stay triggered by a petition for bankruptcy pursuant to §362, in that to *obtain a relief* from the injunctive stay invoked by operation of law, a party *must* seek, and successfully obtain *court ordered relief from that stay*. This case certainly shows absolutely no evidence of any such request, or court ordered relief from the statutory congressionally mandated protections available to Appellant, and other qualified Servicemembers.

The SCRA provision expressly restricting foreclosure constitutes "a serious prohibition aimed at keeping members of the armed forces free of foreclosures which would be distractions, and unfair while they serve their country." Brewster v. Sun Trust Mortg., Inc., 742 F.3d 876, 878 (9th Cir. 2014). The protection against foreclosure on property during or shortly after one's active military service was even part of the SSCRA's original enactment in 1918 and its reenactment in 1940.[3] The SSCRA, however, provided this protection from sales, foreclosures, or seizures of property "made during the period of military service or within *three months* thereafter." Pub. L. No. 65-103, 40 Stat. 440, 444 (1918); Pub. L. No. 76861, 54 Stat. 1178, 1183 (1940).

---

[3] See SSCRA, Pub. L. No. 65-103, 40 Stat. 440, 444 (1918); SSCRA of 1940, Pub. L. No. 76-861, 54 Stat. 1178, 1183. See Housing and Economic Recovery Act, Pub. L. No. 110-289, 122 Stat. 2654, 2849 (2008 amendment); Honoring America's Veterans and Caring for Camp Lejeune Families Act, Pub. L. No. 112-154, 126 Stat. 1165, 1208 (2012 amendment).

The United States Supreme Court has also spoken regarding the Act, holding that the statute *must* be read with an eye friendly to those who dropped their affairs to answer the country's call. (See Re: LeMaistre v. Leffers, 333 U.S. 1, 6 (1948)); *Emphasis added.* And that the law always is to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation"; (see also Re: Boone v. Lightner, 319 U.S. 561, 575, 63 S. Ct. 1223, 1231 (1943)). Restated then, the SCRA must be read essentially in favor of the Servicemembers it is intended to protect. Appellant therefore seeks reconsideration on issues regarding:

- Whether the SCRA is indeed a *self-executing* statute based on military "Active Duty", or whether like here, every Servicemember is required to apply for and obtain a Court Order - prior to invoking the protections or benefits Congress promised in the Act; Appellant furthermore seeks clarification from the Court as to why at least in appearance, in this case, an obituary far stricter standard than is normally applied to other Servicemembers to obtain federally protected SCRA Rights, if not for reasons of r*ace, national origin, or other unlawful reasons*.

### (b) *The Foundational Case*

The bankruptcy Court and this district Court hinged their decisions in this case on *in re Brown*, 290 B.R. 415 (Bankr. M.D. Fla. 2003). But that case has absolutely nothing to do with the particular facts here, which instead relate to a predatory creditor possibly engaged in fraud, and devoted to circumventing federal law and *due process*, at any costs. Another glaring distinction is, here Appellee EMIGRANT simply has not once sought, nor obtained, lifting of the federally imposed statutory stays - neither before nor after, to validate its *post-petition* sales –

even prior to unduly seizing Appellant's property and illegally evicting him and his [supposedly] protected military family members. . . within merely a few days of separation from Active Duty.

The record and naked facts here also show that EMIGRANT instead purposefully filed its foreclosure actions in bad faith, based on entirely meritless *legally impossible ab initio* claims based on forged *mortgage instruments*. Then, absent due process, obtained default *summary judgments* for over *one and half million dollars*, against a [supposedly] **SCRA protected** Servicemember; unfairly forcing him into bankruptcy.

Indeed, the court in *Brown* does not once even mention the SCRA, which was in fact enacted several months later in December 2003. Whereas, in this dispute, the federal **SCRA protected Rights** and property belonging to someone already known to be deployed on Active Duty lays at the very heart of the controversy; but not so in *Brown*. Rather, that case concerns a Tampa debtor, Ms. Brown, with a history of post-petition delinquencies despite repeated written warnings from the bankruptcy court. It also did not involve any conniving false creditors.

Accordingly, all the circumstances in *Brown*, the sole foundational case relied on so far, are completely dissimilar, other than both cases seem to involve a chapter 13 petition. Albeit that, in this instant the petition had be filed to put an end to *systemic due process violations* and outright fraud intentionally committed in the State-Court, against a homeowner and his protected military dependents; See HERA, 2008. The record of this occurring is public, well known, and was made part of this case. So, the decisions here could hardly be based on a more distinct chapter 13 case, since the facts and circumstances in *re Brown* are mostly irrelevant to this case.

### (c) *Constitutional due process*

The Court's decision seems seriously at odds with fundamental provisions and the basic rights in the United Sates Constitution, and even Florida's state constitution, guaranteeing *due process* and equal protections under the law, regardless of *race, national origin*, or for that

matter, protected *military service affiliation*; issues at the very center of this case. For starters, a federal Court reviewing this case first and foremost must analyze whether the *initial wrongful dismissal* at issue - namely the one orchestrated by the trustee[4] on July 1, 2009, while Appellant was already known to be deployed serving the United States, could even ever legally take effect - based on Constitutional guarantees of *due process and equal protection*.

Especially in *federal bankruptcy proceedings*, and certainly prior to lifting a statutory injunctive stay protecting the property and *basic rights* of someone known to be serving overseas in the *common defense*, legally sufficient **Notice and Hearing** calculated as *reasonable and constitutionally sufficient* under the circumstances, <u>must</u> be afforded. It is well accepted that constitutionally sufficient notice should also give the parties at least an opportunity to be heard and to file objections, which clearly never occurred in this instance; since the *dismissal order* at issue was docketed merely one after the trustee's malevolent motion. The entire body of bankruptcy law and jurisprudence generally agree that, absent the required *notice and a hearing*, an order <u>purporting to dismiss</u> a bankruptcy petition to remove the §362 automatic stay, is **invalid** as <u>*lacking constitutional due process*</u>.

Accordingly, the automatic stay in this case actually remained in effect throughout July and August in 2009, thus rendering both unapproved sales void *ab initio*. Also, because by deliberate design and execution, the wrongful dismissal was maliciously orchestrated to, without notice, foreclose the **due process rights** of Appellant and deny him any opportunity to object or defend against the fraudulent claims filed against him during his military deployment. Such a scheme not only denies fundamental Constitutional guarantees, but when successfully facilitated and carried out against a deployed Servicemember - or by extension - against all members of the

---

[4] The Federal Trustee's Guidelines and Handbook require the standing trustee to refer cases involving Debtors on Active Duty performing military service to the Regional Trustee office, not seek a dismissal.

military, could certainly give *aid and comfort* the Country's enemies and produce demoralizing effects on members of the military, and the national defense; and is against sound public policy.

For these reasons alone, this Court should enforce the *expressly stated* congressional intent of the SCRA *"... to expedite the national defense."* It therefore should have reversed the erroneous decision of the Bankruptcy Court, which here runs contrary to the *public's interests*, could *weaken the national defense*, and wrongly encourages *creditors* and others to circumvent or avoid the federal solvency statutes and Bankruptcy Code, and also needlessly disregard constitutional due process and provisions of the SCRA. Appellant therefore seeks reconsideration regarding:

- Since the first orchestrated dismissal of Appellant's chapter 13 case was issued with clearly insufficient constitutional **notice or hearing** on July 1, 2009, merely *one day* after the trustee wrongly sought a dismissal, how then does the Court's subsequent action(s) based on the *invalid ab initio orders* pass constitutional muster?

**(d) _Termination of Ownership Rights_**

Additionally, the Court's decision here seems to, like Appellee, confuse the crucial difference between _Redemption Rights_ versus **_Ownership Rights_**; the former is relevant only insomuch as it too is a SCRA protected Right, whereas the latter is essential to this case; See SCRA §3936(b). Federal law 50 U.S.C. §§ 3901 et. Seq. (SCRA), expressly provides that . . .

"NO PERIOD OF ACTIVE DUTY MAY BE INCLUDED WHEN COMPUTING TIME LIMITED BY LAW TO REDEEM REAL PROPERTY". The law's plain text states as follows:

> 50 U.S.C. § 3936. Statute of limitations [recodified]
> (a) Tolling of statutes of limitation during military service. The period of a
> Servicemember's military service may not be included in computing any period limited by
> law, regulation, or order for the bringing of any action or proceeding in a court, or in any
> board, bureau, commission, department, or other agency of a State (or political subdivision
> of a State) or the United States by or against the Servicemember or the Servicemember's
> heirs, executors, administrators, or assigns.

**(b) Redemption of real property.** *A period of military service may not be included in computing any period provided by law for the redemption of real property sold or forfeited to enforce an obligation, tax, or assessment.* See also Fla. Sta. §45.031(5).

This expressed statutory provision also *by operation*, renders the August 31, 2009 *post-petition* sale invalid, by law. The main purpose and intent for the prompt issuance of a *time stamped* "Certificate of Sale" is to **terminate** the owner's *Right to Redeem*, or *"pay-off"* property from a *bona fide* mortgagee. In Florida, issuance of a *"sale certification"* by the clerk also starts a ten-day clock to file Objections for sale irregularities. If the owner files a bankruptcy petition with a time stamp *after* the time and date stamp on the clerk's *pre-petition* sale certificate, their **Right of Redemption** may be lost; to protect a bona fide innocent *third party bidder* at the sale - which obviously is not the situation in this particular case.

In any event, **federal law prohibits** *terminating* an owner's <u>Redemption Right</u> to real property, <u>while they are serving on *Active Duty*</u>. This crucial fact of this case simply cannot be refuted. Therefore, to correctly decide this issue one must choose: (1) If Option-**A** is correct; the clerk's Certification of the sale **is valid**, thus it necessarily took place by undue deprivation of Appellants *Redemption Rights* to his home, in violation of federal law. On the other hand, (2) If **B** is the correct option; the Certification and *official statement* **is invalid** *ab initio*, just like on March 30, 2009. Since *according to the bankruptcy Order docketed*, no party disputes the fact that Appellant was indeed deployed on Monday August 31, 2009, at 1:18 PM est., thus the Redemption Rights of Appellant were not legally terminated, <u>*hence no valid sale occurred*</u>.

Here, the Court seems to find option (1) A is true; meaning Appellant's due process and other constitutional protections were abridged by the *purported* Certification of the disputed, intentionally unlawful sale. However, even that flawed finding still fails to change the crucial fact that Appellant's <u>*Ownership Rights*</u> remained intact even long after the bankruptcy *dismissal*

*statute* re-vested his entire chapter 13 estate - including his home; reset the *status quo ante*. *Id* §349

For these and other important reasons, the Court's decision appears starkly at odds and in direct conflict with expressed provisions of Florida statute and the bankruptcy Code concerning preservation of the estate. Section 554(d) states: . . . *"unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."* The Code further states unless the court orders otherwise, all property of the estate is "abandoned" by law at the time a case is ***closed***. See 11 U.S.C. § 554(c). The law provides: *"the stay of an act against property of the estate . . . continues until such property is no longer property of the estate."*; 11 U.S.C. § 362(c)(1). Pursuant to bankruptcy law, a debtor's property is property of the estate until **title** is *legally* transferred to the new *"owner"*.

No one in this case has ever suggested Appellant's property was abandoned, or otherwise administered by the bankruptcy court on August 31, 2009, nor was the case ***"closed"***. According to the docket, this in fact occurred on September 30, 2011 (DE # 86); pursuant to statute and by *operation* of law, property of the estate must re-vested, absent a separate order, for cause. It is therefore undisputed that in this case, the subject property remained part of Appellant's chapter 13 estate throughout 2010, ***by law***, and the alleged sale obviously was ***NOT CONSUMMATED*** in 2009. The chapter 13 case ultimately was dismissed - albeit wrongfully - on November 19, 2010 (DE # 67), premised on the trustee's willful malicious misrepresentations, while Appellant was still serving on military Active Duty, and unable to properly defend himself, and in continued spiteful violation of his protected SCRA Rights and constitutional civil rights. Even so, after the second wrongful dismissal became final (DE # 67), unless *the bankruptcy court* for *just cause* ordered otherwise, the *"dismissal statute"* is self-executing, to *reset the **status quo***

*ante*; *Id* §349. See also *in re Nash* (9th Cir. 1985). So, given the unique set of facts here, the SCRA prohibited unapproved post-petition *alleged "foreclosure"* sale on Monday, August 31, 2009, at 1:18 PM is, and should be declared void, once the case was reopened and an appropriate adversary pleading brought before the bankruptcy Court; regardless of the State-Courts' revenues based shenanigans, and intentional due process violations.

Another of the key issues in this dispute partly boils down also to Appellant's SCRA protected **Ownership Rights**, as defined. *In re Jaar,* 186 B.R. 148 (Bankr.M.D.Fla.1995). This must be properly analyzed, together with the precise *point in time* when property ceases to belong to the *estate*. To be crystal-clear, the mere malevolent issuance of a *"certificate of sale"* by the county clerk is absolutely clearly INSUFFICIENT to extinguish ownership or fully transfer property from a protected bankruptcy estate. This indisputable fact is confirmed by both federal law, and state statute, which in part provide:

*When the certificate of title is filed the sale shall stand confirmed, and title to the property shall pass to the purchaser named in the certificate without the necessity of any further proceedings or instruments. See F.S. 45.031(6).*

EMIGRANT itself has not seriously claimed that it obtained [*legal*] title or "ownership" to the property until February 1, 2013, or nearly four years after the fact.[5] Furthermore, the Court's unremarkable finding that in this instance, Appellant's "**Ownership Rights**" passed away at 1:18 PM est., or at any time on Monday, August 31, 2009, merely by the *county clerk* or anyone else unconnected to, and not employed by, the federal [bankruptcy] court system, issuing a false "Certification" knowingly, raises too many serious Constitutional[6] issues beyond the limits or four corners of this controversy. Moreover, applicable state law and practice mandate

---

[5] Even the Certificate of Title, like other *fraudulent instruments* used in this case to "convey" the property, on February 1, 2013, *falsely certifies* that the sale take place on a bogus invalid date of **"August 31, 2009, 2013"** without any *objections* being filed to the sale. The subsequent *deeds of transfer* also were fraudulently *"witnessed"* and notarize in NY at least several days BEFORE *"the sale"* supposedly occurred in Florida.
[6] The "Bankruptcy Clause" in the Constitution of the United States (COTUS) assigns bankruptcy jurisdiction to the national government, not the states, impart for uniformity.

that, at a very minimum, ten (10) days must elapse before title (or "Ownership Rights") to the property can start to transfer.

Indeed, no one anywhere, except in this case, has ever seriously suggested that a non-bankruptcy court official, like the county clerk, might wheel such immense power over bankruptcy related property, that by merely executing a sale certification or witness affidavit, actually, effectively, finally, unappealably, or even conclusively convey property out of a administered estate, without need for any approval of the bankruptcy court. Not even the bankruptcy clerks and trustees wheel such powers, far less someone who is completely unattached to the federal court system. Indeed, not even the district courts having review powers over bankruptcy cases claim such authority to directly, independently, or unilaterally affect a pending bankruptcy estate. The unremarkable idea raises such serious constitutional and other profound implications - far beyond the scope of this case, that it much better simply to abandon that bizarre suggestion, without any further discussion.

**(e)** ***Powers to Enforce Federal Statutes and Constitutional Provisions***

Unconstitutional acts are void. The law is firmly settled that official *ultra vires* acts violating constitutional protections, intentionally disregarding civil rights, or insufficient due process, are legally void acts. Appellant, by pursuing his possible State remedies first, did not waived any affirmative rights to seek appropriate federal relief against parties to the violative conduct and deprivation of protected rights against him, and / or his military dependents. To correct clear error or manifest injustice, the district Court also enjoys substantial discretion.

Under the Supremacy Clause of the United States Constitution, state laws or actions violating federal law are invalid. *See* U.S. Const. art. VI, cl.2. *See also Shaw v. Delta Air Lines,* 463 U.S. 85, 96 n.14 (1983). It is also clear and well established in law under U.S. Constitution art. III (Bankruptcy Clause), that State Courts are not vested jurisdiction nor any

final legal authority to bindingly adjudicate and, or to decide bankruptcy estate core matters and disputes derived from cases filed, or otherwise commenced under Title 11 bankruptcy law; 28 U.S.C. 151, & 1334(a), & 1471(e). See also Bankruptcy Rules 7001 and 9014. Legally <u>invalid</u> acts are not afforded *finality*, may be attacked at **any time**, and the court has no discretion to enforce a void order. Thus, once confronted with a void action or **unconstitutional order**, it is obliged to vacate such orders, and is without any discretion to enforce unconstitutionally orders.

**WHEREFORE**, Pursuant to Fed. R. Civ. P. 59, Appellant, hereby move this Court for reconsideration and, or clarification of the foregoing issues pertaining to this case, and including:

(a) Adequate analysis of whether the SCRA stay is a **self-executing Stay** based upon *Active Duty* status,

(b) Analysis of *Constitutionally Sufficient Notice and Hearing* of the VACATED dismissal ordered on July 1, 2009.

(c) Legal analysis of the timing when, and by precisely which <u>*mechanism*</u>, were **Ownership Rights** extinguished prior to the purported **"*Certificate of Title*"** on February 1, 2013, nearly four years after the fact[7] based on the unapproved certification of a *post-petition* sale, under 11 U.S.C. §362(d).

(d) Analysis of relevance of *legal standing* pursuant to the Bankruptcy Code and Rule 3001 mandating a showing by evidence to prove sufficiently whether in fact a *perfected security lien* existed in the bankruptcy case.

Respectfully submitted,

Dated: January 17, 2018.

Joseph L. Worrell, pro se.
P.O. Box 30071
West Palm Beach, FL  33420

**SERVICE *VIA ECF***
SERVICE LIST ATTACHED.

---

[7] Even the Certificate of Title, like all the other ***fraudulent instruments*** used in this case to "convey" the property, on February 1, 2013, ***falsely certifies*** that the sale take place on a bogus invalid date of **"August 31, 2009, 2013"** without any ***objections*** being filed to the sale. The subsequent "*deeds of transfer*" also were fraudulently "***witnessed***" and notarize in NY at least several days BEFORE "*the sale*" supposedly occurred in Florida.